**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **HOMER W.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 19 C 5663** |
| **v.** | ) | |
| | ) | **Magistrate Judge Gabriel A. Fuentes** |
| **KILOLO KIJAKAZI, Acting** | ) | |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Homer W.[3] was born on March 2, 1965, and applied for Supplemental Security

Income ("SSI") on August 1, 2012, alleging that he had been disabled since February 7, 1996

because of a gunshot wound to his right leg, depression, high blood pressure ("HTN") and seizures.

(R. 175, 179.)  He stated in his application that he had not held a job since his alleged onset date

---

[1] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On October 8, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 9.)

[3] The Court in this opinion is referring to Plaintiff by his first name and first initial of his last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id*. A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id*., citing *Doe v. Blue Cross & Blue Shield United of Wis*., 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated.

("AOD"), which is the day he was shot. (R. 180.) After a hearing and denial by an ALJ on April 24, 2014, the case was remanded by the district court. (R. 14-33, 757-80.) In the interim, Plaintiff filed a second application on September 1, 2015, which amended his onset date to April 25, 2014. (R. 941.) The Appeals Council ordered that the second application be consolidated with the first case. (R. 781-84.) Therefore, on September 19, 2017, an ALJ held a new hearing on both cases and denied them in an order on November 28, 2017. (R. 673-701.) The Appeals Council declined to assume jurisdiction, making the ALJ's decision the final decision in this case. (R. 663-67.) *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021). Before the Court are Plaintiff's memorandum seeking remand of that decision (D.E. 17) and the Commissioner's motion to affirm. (D.E. 28.)

## I.     Administrative Record

### A.     Medical Evidence

In February 1996, Plaintiff sustained a gunshot wound to his upper right thigh; he fractured his femur and hip, bringing about surgery to insert an internal metal plate. (R. 175-79.) Plaintiff was later imprisoned from November 2010 through July 23, 2012, and while in prison, in August 2011, he began experiencing a recurrent abscess on his right thigh caused by an MSRA (staph) infection. (R. 204, 309-11, 499.) The abscess was cleaned regularly by prison medical staff and treated with Motrin and antibiotics; medical records from Plaintiff's time incarcerated show that it would heal for a period of time and then re-open when he stopped taking his prescribed medications. (R. 320-32, 340.) In March 2012, an X-ray showed changes to Plaintiff's leg bone around the area of the abscess and internal plate which suggested a bone infection. (R. 474, 476.) In July 2012, medical records indicate that the wound had re-opened and was draining; Plaintiff was prescribed an antibiotic. (R. 455-62.)

After hjs July 2012 release from custody, Plaintiff visited the Will County Community Health Center in August 2012 for a routine, post-incarceration check-up. (R. 532-33.) The medical records from this visit discuss Plaintiff's seizure disorder, high blood pressure, and normal mental status evaluation but do not mention his thigh abscess; his range of motion, muscle strength and stability were normal. (R. 534.)

In November 2012 Plaintiff visited the Provena St. Joseph's emergency department to have his abscess cleaned and rebandaged; he described having "intermittent" problems with it during the previous year. (R. 569, 604.) An X-ray at the time showed that one of the screws holding the internal plate may have come loose. (R. 616.) He returned to the Will County Community Health Center for a follow-up appointment one week later, and notes from that visit state that the abscess was draining and improving, and that Plaintiff was taking an antibiotic; on December 28, 2012, the abscess was characterized as "resolved." (R. 578.) Plaintiff visited the St. Joseph's emergency department again on January 27, 2013, to report the abscess had started draining that morning; he was given an antibiotic and two days later reported that the wound was healing and his pain was greatly improved. (R. 612-14.) In April 2013, Plaintiff reported that the abscess had been draining for a month and that he not been taking antibiotics. (R. 622-24.) On June 11, 2013, he visited Will County Community Health for medication refills and on July 9 reported to the St. Joseph's emergency department that he was supposed to be taking an antibiotic but had run out a month earlier and the abscess was draining again. (R. 628, 631.) On August 11, 2013, Plaintiff visited Baptist Hospital for wound care, and then on September 12, 2013, he returned to the St. Joseph's emergency department complaining of depression and chronic pain. (R. 640, 643-46.) Two days later, he followed up for care of his abscess and was prescribed antibiotics again; he had not been taking any at the time. (R. 633, 1317.)

On November 5, 2013, Plaintiff had a psychiatric evaluation and was diagnosed with a mood disorder and depression and prescribed Cymbalta and Trazadone. (R. 650-52, 1337.) He visited the Aunt Martha Health Clinic on June 22, 2014, because the abscess had opened and was draining. (R. 1136.) He reported feeling depressed and was assessed to have mild depression; he was prescribed antibiotics and ordered to continue taking his Cymbalta and Trazadone. (R. 1137-39.) Plaintiff returned to the Aunt Martha Health Center on September 17, 2014, for leg pain. (R. 1132.) On physical examination Plaintiff exhibited no mental health problems (although was noted to have chronic depression) and had mildly reduced range of motion and tenderness on his right leg; the abscess on his right thigh was visible and had been there for two days. (R. 1133-34, 1293.) He was prescribed antibiotics for his abscess. (R. 1135.)

In February 2015, plaintiff visited the emergency room for leg pain but did not attribute it to his abscess, and medical records from this visit do not mention an abscess. (1265-69, 1272.) On June 15, 2015, Plaintiff underwent surgery to remove the metal plate and screws in his leg, which had come loose and become dislodged. (R. 1140, 1201, 1272-78.) After Plaintiff recovered from surgery, his abscess healed and did not recur. (R. 1141-44.) Plaintiff continued to complain of hip pain after the plate was removed. (R. 1437.) At a September 2015 examination, Plaintiff complained of leg pain and had limited range of motion and tenderness in his right hip but denied difficulty walking, numbness, sleep disturbance, or swelling. (*Id.*) He reported that his regular exercise was walking, and a nurse practitioner recommended that Plaintiff use a cane for added stability and that he walk for exercise 30 minutes per day. (R. 1438.)

In October 2015, Plaintiff underwent a mental health assessment through the Will County Health Department. (R. 1471.) He reported experiencing symptoms of depression and anxiety for the past two years. (*Id.,* 1472.) Plaintiff had been working at Trader Joe's for several months but

reported that he was planning to take a leave of absence because the physical demands of the job were too much for him and that he had difficulty standing and lifting. (R. 1478.)  Although he had applied for disability, Plaintiff informed the questioner that he would be willing to look for a job that did not require standing or lifting but he did not know if he would be able to find one due to his lack of high school diploma. (*Id.*)  He met several times with a therapist and also with psychiatrist Jan Stampley, M.D., from July 2014 through September 2015. (R. 1457-1500.)  Dr. Stampley refilled Plaintiff's prescriptions for Cymbalta and Trazadone and diagnosed him with a mood disorder; his mental status evaluations were generally normal. (*Id.*)

On December 19, 2015, Plaintiff had a consultative examination in connection with his application for benefits.  (R. 1501.)  The examining doctor found Plaintiff had right hip tenderness and decreased range of motion and could walk more than 50 feet without support, including without his cane. (R. 1503.)  He reported being able to stand for 15 to 20 minutes before experiencing leg pain and that he could lift 20 pounds.  (R. 1502.)  He walked with a slight limp. (R. 1503.)

In October 2016, Plaintiff visited the Will County Health Clinic for treatment of a mood disorder and depression; he was prescribed Citalopram.  In March and June 2017, Plaintiff visited Primary Care of Joliet for treatment of back and hip pain, for which he was prescribed the pain medication Tramadol.  (R. 1126-31.)

The medical record contains two sets of opinions from non-examining Agency doctors in connection with Plaintiff's two claims for benefits.  For Plaintiff's first application for benefits, Agency doctors reviewed medical records from the Will County Medical Center, St. Joseph's hospital and the Grundy County Medical Clinic dated prior to September 2012.  David Voss, Ph.D, found that Plaintiff did not have a mental impairment, and that there was no evidence in the record

at that time showing treatment for a mental health condition. (R. 63.) Regarding his physical health, Ernst Bone, M.D., opined that Plaintiff had no physical limitations, could work at the heavy or very heavy level, and thus was not disabled because the medical evidence at the time showed that despite Plaintiff's alleged limitations with lifting, squatting, walking and kneeling, he had full ROM in all joints, normal muscle strength and no gait abnormalities. (R. 65-66.) These findings were upheld on reconsideration on January 28, 2013. (R. 75.)

In February 2016, in connection with Plaintiff's second application, Joseph Cools, Ph.D, reviewed notes from Plaintiff's December 2015 mental status evaluation and opined that Plaintiff had a non-severe mental impairment. (R. 792.) Lenore Gonzalez, M.D., also reviewed the medical evidence of record, including documents from Will County Health and St. Joseph's regarding treatment of Plaintiff's leg pain and subsequent surgery to remove the metal plate, and concluded Plaintiff was capable of light work, which included occasionally lifting and carrying up to 20 pounds and frequently lifting or carrying up to ten pounds and that he could walk, stand, or sit for six hours out of an eight-hour workday. (R. 797, 799.) In her opinion, Dr. Gonzalez noted that the December 2015 consultative examination showed Plaintiff had normal extremity strength and function, that he walked with a slight limp, was able to get on and off the examination table and was able to walk more than 50 feet without his cane, although the doctor acknowledged that Plaintiff said he normally walked with a self-prescribed cane. (R. 800.) On reconsideration, two more Agency doctors reviewed the same medical evidence and also records from several kidney appointments Plaintiff had in 2016 and affirmed the opinions, concluding Plaintiff could perform light work and was not disabled. (R. 810.)

### B.    Hearing

At the hearing on September 19, 2017, the Plaintiff had his cane with him and testified that he used it to keep himself stable when he walked. (R. 706.)  He stated that he had pain in his right hip and lower back and that he rated it as 10/10 in intensity and was in constant pain every day. (R. 711.)  He took pain medications and a muscle relaxer to help with his hip and did not have any trouble complying with medical treatment.  (R. 712-13.)  He estimated that he could stand for 10 to 15 minutes before having to sit down and walk about a block at a time before needing to rest. (*Id.*)  He could sit for about 30 minutes before needing to change his position.  (*Id.*)    Plaintiff testified that he sometimes walked to a nearby park to get some fresh air, and that he could make it about half a block before needing to stop because of pain. (R. 715.)  Since his surgery to remove the plate in his leg, his pain had moved from his hip to more in his back.  (R. 716.)

A vocational expert ("VE") also testified.  He said that for an individual who could perform medium work with no climbing ladders, ropes, or scaffolds or exposure to dangerous machinery, and who lacked the ability to remember and carry out detailed instructions but had the sustained concentration for simple work and brief contact with the general public, there were a large number of jobs in the national economy available such as hand packager or production helper. (R. 720-21.)  When the ALJ asked about an individual who could perform light work with the same additional limitations the VE testified that jobs such as bench assembler and electronics worker were available.  (R. 722.)  If the individual had to use a cane to walk, he would be limited to sedentary work only.  (*Id.*)

### C.    ALJ Decision

The ALJ undertook the five-step process pursuant to 20 CFR § 416.920(a) and found that Plaintiff had the severe impairments of seizure disorder, history of gunshot wound to the right leg,

abscess on his right thigh, hip fracture due to gunshot wound repaired with pins and plates, obesity, polysubstance dependence in remission, mood disorder and antisocial personality disorder. (R. 678.) At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets a Listing. (*Id.*) The ALJ considered Plaintiff's right thigh gunshot wound and abscess (also referred to in the medical record as a boil) pursuant to Listings 1.02 (major disfunction of a joint), 1.08 (soft tissue injury) and 8.04 (chronic skin infection).[4] As relevant to our decision, the ALJ determined that while there was evidence of chronic infection of the skin in the form of an unhealed abscess on Plaintiff's right thigh, the abscess did not occur after Plaintiff's gunshot wound in 1996 but only first occurred when he was incarcerated in 2010 and 2011 and contracted an infection. (*Id.*) Plaintiff did not meet Listing 8.04 because he did not meet the durational requirement; the ALJ noted that the Listing requires a skin lesion to persist for at least three months despite treatment. (*Id.*) Plaintiff's abscess responded to treatment and healed with regular medication, recurring only when he was non-compliant with treatment protocol. (*Id.*)

The ALJ next evaluated Plaintiff's mental impairments against the Paragraph B criteria and determined that he had mild limitations in his ability to perform activities of daily living and in social functioning, mild-to-moderate difficulties in concentration, persistence and maintaining pace, and mild limitations in adapting or managing himself. (R. 681-82.) Because Plaintiff did not have at least two marked limitations or one extreme limitation, the Paragraph B criteria were not satisfied. (R. 682.) The ALJ then assigned Plaintiff an RFC for medium work, except that he could not lift more than 50 pounds occasionally and 25 pounds frequently.[5] (R. 683.) He could

---

[4] The ALJ also explained why Plaintiff did not meet a Listing with respect to his other impairments; Plaintiff does not disagree with those assessments.

[5] Under the Social Security regulations, "medium" work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. https://www.ssa.gov/OP_Home/cfr20/404/404-1567.htm "Occasional" activities can be performed for up

stand, sit, or walk for six hours in an eight-hour workday and could never climb ladders, ropes or scaffolds and have only occasional exposure to dangerous, moving machinery or unprotected heights. (*Id.*) The Plaintiff lacked the ability to understand, remember, or carry out detailed instructions but retained the sustained concentration needed for simple work, and he could have occasional brief and superficial contact with the general public. (*Id.*)

In support of her RFC, the ALJ first discussed the reasons she found Plaintiff to be not entirely credible with respect to his testimony about the severity of his symptoms, which were "not entirely consistent" with the medical evidence. (R. 684.) That is, the ALJ found that while Plaintiff's various impairments could reasonably cause his alleged symptoms, those symptoms were not as severe and disabling as Plaintiff contended. (*Id.*)

Specifically, the ALJ first explained that in a Function Report Plaintiff completed in 2012, Plaintiff and his mother both stated that he left his house to go to school,[6] church meetings, and doctors' appointments. (*Id.*) Other reasons the ALJ found the Plaintiff's statements about the severity of his symptoms were not consistent include that Plaintiff failed to follow medical advice or adhere to treatment plans at times despite testifying that he had no problems getting or complying with medical treatment, and that Plaintiff told his psychiatrist he would be willing to look for a job that did not require standing or lifting but didn't think he could get one because of his lack of high school diploma and prior legal problems. (R. 684-85.) The ALJ interpreted this information as demonstrating Plaintiff's belief that he could have worked at a sedentary job but chose not to for reasons other than his impairments. (*Id.*) The ALJ also found it inconsistent that

---

to two hours out of an eight-hour workday and "frequent" activities can be performed for up to six hours in an eight-hour workday. https://www.ssa.gov/OP_Home/rulings/di/02/SSR83-10-di-02.html.

[6] It is not clear from the record what "school" Plaintiff attended or if he was referring to his activity of walking to a nearby school for exercise.

Plaintiff complained of difficulty walking but reported to examining doctors and in his Function Report that his regular exercise was walking and that he participated in a number of daily activities that involved walking and standing such as mowing the lawn, shopping, and attending school. (*Id.*) Moreover, although Plaintiff complained of leg pain, he denied numbness or weakness, and while he testified that he began using a cane in 2015, examination notes from that year do not mention one. (*Id.*)[7] Further, although various medical records reflect that Plaintiff complained of hip pain and tenderness, there was no evidence to support Plaintiff's contention that his impairments were so severe that they mostly confined him to his bed. (*Id.*)[8]

To this point, the ALJ explained that although Plaintiff complained of right leg pain and tenderness, the degree of his complaints varied from reports that his symptoms were fairly-well controlled to complaints of constant severe pain, particularly after his 2015 surgery to remove the hardware in his right leg, after which he complained of pain in his thigh and back but on at least one occasion denied difficulty walking. (R. 686-87.)[9] Therefore, concluded the ALJ, because Plaintiff acknowledged and demonstrated the ability to do activities that involved some lifting, carrying, walking, and standing, and considering his history of right femur and hip fracture as well as recurrent abscess that resolved quickly with medication, the ALJ limited him to the demands of a reduced level of medium work. (R. 687.)

---

[7] The ALJ explained that she did not include a recommendation that Plaintiff use a cane in her RFC because the evidence showed that, at most, it was suggested that Plaintiff use it for stability following surgery; there was no indication that it would be medically necessary for a 12-month period and Plaintiff himself indicated that he did not use it consistently. (R. 686.) Moreover, Plaintiff testified both that he used the cane "most of the time" and then later reported that he used it if he was going to walk more than one block. (R. 683.)

[8] It is not clear what evidence the ALJ relies on for her contention that Plaintiff spent much of his day in bed; it was not part of his testimony at either of his two hearings.

[9] Indeed, the ALJ notes that at a 2015 post-surgery examination, a nurse practitioner recommended that Plaintiff walk 30 minutes per day for exercise. (R. 685.)

With respect to Plaintiff's mental impairments, the ALJ acknowledged that Plaintiff was prescribed the anti-depressant Cymbalta after reporting depression and chronic pain at an ER visit in September 2013, but the ALJ noted that generally, the evidence showed little treatment for mental impairments. (R. 688.) Moreover, although Plaintiff had been evaluated for a mood disorder in prison, it had been ruled out and he instead inconsistently reported being diagnosed with depression while incarcerated although there is no record of such a diagnosis from prison. (*Id.*) Finally, the ALJ acknowledged that Plaintiff did receive some treatment from psychiatrist Jan Stampley beginning in September 2015, and records of those visits reflect symptoms consistent with moderately severe major depressive disorder. (R. 688.)

The ALJ gave the opinions of all the state agency consultants little weight because neither set of opinions (those associated with Plaintiff's first application and those from his second) had the opportunity to view the combined records submitted with both claims. (R. 689.) Specifically, the first set of consultants – who assigned Plaintiff no exertional limitations at all – did not consider the evidence pertaining to the removal of the plate from Plaintiff's leg. (*Id.*) The second set of consultants, who assigned Plaintiff a light RFC, did not have the opportunity to view the earlier records that were submitted with the first claim, and the ALJ found that the most recent medical records showed few problems that would impact Plaintiff's ability to sit, stand, walk or lift. (*Id.*)

The ALJ concluded by determining that, given the VE's testimony that jobs existed in the national economy that could be performed by someone with Plaintiff's RFC, he was not disabled. (R. 690.)

## II. LEGAL STANDARD

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151

(2019). Disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (citing 42 U.S.C. § 423(d)(1)(A)). When a claimant appeals an ALJ's decision denying benefits, the Court's role is limited to confirming that the ALJ applied the correct legal standard and that there is substantial evidence supporting his or her determination. *Stephens,* 888 F.3d at 327.

Substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Zach v. Saul,* 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek,* 139 S.Ct. at 1154.) While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young*, 362 F.3d at 1001. Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). The Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535,539 (7th Cir. 2003); *see also* 42 U.S.C. § 405(g).

## III.   ANALYSIS

Plaintiff argues that the ALJ erred (1) by finding Plaintiff's impairments did not meet a listing; (2) by assigning Plaintiff an RFC for medium work that was not supported by substantial evidence; and (3) by incorrectly evaluating Plaintiff's credibility. (Pl. Mot. for Sum. J. at 7). While

we ultimately remand because the ALJ did not support her RFC determination with substantial evidence, the additional two issues require discussion as well.

### A.  Listing 8.04

As an initial matter, we find that the ALJ properly supported her determination that Plaintiff did not meet a Listing.[10]  It is a Plaintiff's burden to show that he or she meets all the requirements of a listed impairment. *Filus v. Astrue,* 694 F.3d 863, 867 (7th Cir. 2012). To qualify as disabled under listing 8.04, a claimant must prove that he or she has been afflicted with chronic infections of the skin or mucous membranes, with extensive fungating or extensive ulcerating skin lesions that persist for at least 3 months despite continuing treatment as prescribed." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.  For skin lesions to be "extensive," the regulations explain that they must "involve multiple body sites or critical body areas, and result in very serious limitation." 20 C.F.R., Part 404, Subpt. P, App. 1, § 8.00(C)(1).  Examples include lesions that interfere with the motion of a joint and that seriously limit the use of extremities. *Id.*

In this case, the ALJ substantially supported her determination that Plaintiff's abscess did meet the listing definition of "chronic infection of the skin" because there is no evidence that the abscess persisted for at least three months while Plaintiff was compliant with treatment.  Although Plaintiff points to records discussing his being prescribed antibiotics at various times, he does not specifically identify any time period of at least three months where the evidence shows that the abscess persisted while he was consistently taking prescribed medications.  Moreover, even if Plaintiff could identify such a three-month period, he offers no evidence that the abscess met the

---

[10] While not the basis for remand, we are taking the time to make clear that Plaintiff should not raise the Listing argument again.  Judge Rowland previously found that "the state-agency physicians reviewed the record and concluded that Plaintiff's ailments do not meet any listing." (R. 770-71.)  We now additionally find that beyond what the state-agency doctors did or did not consider, the ALJ independently supported with substantial evidence her conclusion that Plaintiff's abscess does not meet a listing.

listing's severity requirement that it seriously limited the use of one or more extremities. Instead, as Defendant notes, Plaintiff's complaints about his difficulties with walking, standing, and leg pain continued well after the abscess healed following his 2015 surgery, which belies his contention that it was the abscess that caused his limitations as opposed to residual damage from the original gunshot wound or surgeries.

**B.      The ALJ's RFC Determination Is Unsupported by Substantial Evidence**

Plaintiff contends that the ALJ did not cite adequate evidence to support her determination that he was able to stand and walk for six hours out of an eight-hour workday.  After carefully considering the ALJ's opinion and the parties' arguments, we find that whether the ALJ supported the standing and walking requirements of her RFC determination was a close call, but the ALJ did not support with substantial evidence her decision to assign Plaintiff an RFC to perform work at the medium level of exertion.

The difference between a medium and light RFC involves the amount to be lifted; a medium RFC allows for lifting and carrying up to 50 pounds and frequent lifting of 25 pounds, while a light RFC allows for lifting and carrying of up to 20 pounds with frequent lifting and carrying of up to 10 pounds; both categories of exertion require standing and walking for up to six hours in an eight-hour day. SSR 83-10.   The ALJ assigned Plaintiff a medium RFC (modified to remove work on scaffolds and ladders) that said Plaintiff could lift and carry up to 50 pounds occasionally and 25 pounds frequently and stand, sit or walk for up to six hours in an eight-hour workday.

The ALJ failed to support with substantial evidence her determination that Plaintiff was able to perform the lifting and carrying requirements of medium work.  As we explain below, the

ALJ's error only concerns her assigning Plaintiff a "medium" lifting and carrying RFC, not her determination that Plaintiff was able to stand and/or walk up to six hours in an eight-hour workday. The ALJ's justification for assigning a medium RFC – as opposed to sedentary or light, for example – was nearly non-existent beyond her statement that Plaintiff acknowledged and demonstrated the ability to do activities that involved some lifting, carrying, walking, and standing. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (holding that RFC assessment cannot stand where ALJ failed to identify medical evidence to substantiate his conclusion); SSR 96-8p ("RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts ..."). Plaintiff testified at the 2017 hearing that he could lift and carry no more than 20 pounds, a contention he also made in his 2012 Function Report and to the consultative examining doctor in 2015. The ALJ points to no evidence to call this testimony into question, to support her finding that Plaintiff could lift up to 50 pounds occasionally and 25 pounds frequently, or otherwise to explain why she assigned Plaintiff a medium and not a light RFC, given that they both have the same walking and standing requirements. *Balbina K. v. Kijakazi*, No. 20-CV-5078, 2022 WL 2046216, at *3 (N.D. Ill. June 7, 2022) (finding that ALJ erred, among other reasons, by assigning RFC that included frequent use of foot pedals without explaining why she limited Plaintiff to frequent pedal use instead of something less).

In finding that the ALJ failed to support her medium RFC with substantial evidence, we also note that the second set of Agency medical opinions assigned Plaintiff an RFC for light work. Although the ALJ rejected these opinions, her reason for doing so was that they did not take into account the 2012 medical opinions or evidence. But this makes no sense; the ALJ rejected the 2012 opinions (which found Plaintiff to have no physical limitations at all) and assigned him a medium RFC instead, acknowledging that the 2012 opinions were inconsistent with later medical

evidence showing that Plaintiff did in fact have some physical limitations. After she rejected the 2012 medical opinions, the ALJ gave no other reason for giving little weight to the only other medical opinions in the record – the 2015 opinions which stated Plaintiff could perform light work. But reject them she did, thus creating an "evidentiary deficit" that required the ALJ to point to other substantial evidence to support her RFC. *See Suide v. Astrue*, 371 F. Appx. 684, 689–90 (7th Cir. 2010). *See also Yvonne K. C. v. Kijakazi*, No. 20 C 1147, 2022 WL 1104506, at *2 (N.D. Ill. Apr. 13, 2022), *citing Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012) ("Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct h[er] own RFC finding without a proper medical ground and must explain how [s]he has reached h[er] conclusions.")

In sum, the ALJ included limits within Plaintiff's RFC, but failed to explain why she included the particular limits she did. *Balbina v. Kijakazi*, 2002 WL 2046216 at *3.[11] Because she both failed to support with substantial evidence her decision to reject the 2015 medical opinions and also failed to point to other substantial evidence beyond the opinions to support her medium RFC, we cannot trace her reasoning for assigning Plaintiff that RFC, and that requires remand.

---

[11] Although the ALJ's assessment of Plaintiff's mental health impairments are not a basis for this order's determination to remand the ALJ's opinion, we note that this assessment by the ALJ was supported by substantial evidence. The ALJ discussed Plaintiff's complaints about his mental health and reviewed his treatment throughout the claims period before addressing them in her RFC determination. Plaintiff's vague argument that one particular treatment note warrants additional – unspecified – accommodation is little more that a disagreement with how the ALJ weighed the evidence, and the ALJ was not required to address "every snippet of information" even if it was inconsistent with the remainder of the record. *Pepper v. Colvin,* 712 F.3d 351, 362 (7th Cir. 2013). In this case, Plaintiff argues that one such "snippet" (a treatment note suggesting that Plaintiff's symptoms could reflect bi-polar disorder) could be the basis for additional limitations by the ALJ but does not suggest any specific limitation that would be mandated by the comment or explain why the RFC as written does not adequately address his mental health limitations. *Ruby v. Kijakazi,* 20 C 4811, 2022 WL 1457833 at *2 (N.D. Ill. May 9, 2022) (It is Plaintiff's burden not only to establish the existence of an impairment but also to provide evidence supporting specific limitations affecting his capacity to work.)

Plaintiff also argues that the ALJ's credibility analysis, on which she rests much of her justification for her RFC, was faulty. We disagree.

To determine the credibility of a claimant's allegations, the ALJ should consider factors including "objective medical evidence of the claimant's impairments and treatment," "a claimant's treatment history," *Deborah M. v. Saul*, 994 F.3d 785, 789-90 (7th Cir. 2021), and "any inconsistencies between the allegations and the record." *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020). "As long as an ALJ gives specific reasons supported by the record, we will not overturn a credibility determination unless it is patently wrong." *Grotts v. Kijakazi*, 27 F.4th 1273, 1279 (7th Cir. 2022). An ALJ's assessment is patently wrong if the decision lacks any explanation or support. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017).

In support of her RFC, the ALJ spent a considerable amount of time discussing Plaintiff's credibility – but only with respect to his ability to walk. Specifically, the ALJ pointed to Plaintiff's own admission that he walked for exercise, his participation in a number of activities that involved walking, his testimony that he only used his cane if he needed to walk more than a block, a consultative examination that found him able to walk more than 50 feet without his cane, and a post-surgery medical examination during which he complained of pain but denied difficulty walking. Plaintiff contends that the ALJ's credibility determination was flawed because she relied on supposed inconsistencies between Plaintiff's allegations and the medical evidence that were not actually inconsistent. Plaintiff is incorrect.

For example, Plaintiff argues that the ALJ erred by noting that Plaintiff first stated that he used a cane most of the time but later explained that he used it if he was walking more than a block; Plaintiff says these two statements are not inconsistent because he did not say he *only* used his cane to walk more than a block. (Pl. Mem. in Support of Sum. J. at 13). But this is a distinction

without a difference; the ALJ accepted that Plaintiff used a self-prescribed cane at times and then explained she did not include it in her RFC because there record contained ample evidence that Plaintiff could walk without his cane and also that the single recommendation for cane use occurred soon after his surgery and there was no indication that his need to use a cane for stability would last for at least 12 months. As another example, Plaintiff contends that it was not inconsistent for him to allege difficulties walking but also to report that he walked for exercise because there was no evidence of how often he did walk. As Defendant points out, however, these two positions are plainly inconsistent with each other, and the ALJ was entitled to rely on them as evidence undermining Plaintiff's credibility.

The fact that the ALJ's credibility determination is supported by substantial evidence does not undermine our determination to remand, however. Nothing in the ALJ's credibility analysis relates to Plaintiff's statements that he was only able to lift and carry 20 pounds but only concerns his allegations about his ability to walk, which is a separate limitation from his ability to lift. *Jeske v. Saul,* 955 F.3d 583, 595-96 (7th Cir. 2020) (Explaining that SSR 96-8p instructs that each function (sitting, standing, walking, lifting, carrying, pushing, and pulling must be considered separately).

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion to remand (D.E. 17) and

denies the Commissioner's motion to affirm (D.E. 28).

**ENTER:**

_____

**GABRIEL A. FUENTES**

**United States Magistrate Judge**

**DATED: July 20, 2022**